**AFFIDAVIT**                                          1:20MJ2207

I, Matthew Scalisi, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

      1.      I make this affidavit in support of criminal complaints charging PHILLIP J.

AUGUSTIN (aka, PJ Augustin or Augustine) ("Augustin") and WYLEIA NASHON

WILLIAMS (aka, Nashon Matthews) ("Williams") (together, "Defendants"), with wire fraud,

bank fraud, attempt and conspiracy to commit wire fraud and bank fraud, in violation of 18

U.S.C. §§ 1343, 1344, 1349, and 2, and charging Augustin with obstruction of justice, in

violation of 18 U.S.C. §§ 1503 and 1512(c)(2), from on or about May 13, 2020 to on or about

July 9, 2020, in the Northern District of Ohio, Eastern Division, and elsewhere.

      2.      Defendants have devised and participated in a scheme to obtain by fraud millions

of dollars in forgivable loans through the Paycheck Protection Program ("PPP") and other

government programs, conspiring with two people now cooperating with the investigation

("CHS 2" and "CHS 3"), and others.[1]  Early in the scheme, Augustin obtained a fraudulent PPP

loan for his own company, Clear Vision Music Group LLC ("Clear Vision"), with CHS 2

providing draft falsified documents for Augustin to use.  After submitting that application,

Defendants then began to work with CHS 2 on a scheme to submit numerous fraudulent PPP

loan applications in order to receive kickbacks from confederate loan applicants.  Augustin

focused on recruiting numerous confederate PPP loan applicants using his network of business

contacts from his work as a manager for professional football players.  Augustin also recruited

---

[1]      The conduct and charges described in this affidavit are part of a larger investigation that is being conducted in this District and elsewhere.  As a result, not all numbered sources and anonymous individuals and entities are described in every filing.  I have included in this affidavit only those individuals and entities I have deemed necessary to explain the particular facts set forth here.

Williams to assist in the scheme.  Early on, Williams obtained falsified documents from CHS 2 to include in fraudulent applications.  Later, she focused on coordinating communications between CHS 2 and the confederates Augustin recruited, primarily by collecting information from them and passing that information to CHS 2 for use in creating falsified documents and applications.  To inflate the size of these PPP loans, and the corresponding kickbacks, the conspirators relied on a variety of false statements, including by submitting falsified bank statements and payroll tax forms.  For example, the conspirators used nearly identical versions of the same fabricated bank statements, recycled in the PPP applications for multiple companies with minor changes.

3.      The conspirators in the scheme planned or prepared at least 90 fraudulent applications, most of which were submitted.  Based on the evidence investigators have reviewed to date, CHS 2, Augustin, and their co-conspirators applied for PPP loans that are together worth more than $24 million dollars, with at least approximately 42 of those loans approved and funded for a total of approximately $17.4 million.  Certain of those loan recipients then wired a kickback of varying amounts, often approximately 25% of the fraudulent loan proceeds, to an account controlled by CHS 2.  Because Augustin had originated the scheme with CHS 2 and recruited so many loan applicants, Augustin expected to receive—and often did receive—sizable kickbacks. CHS 2 paid Augustin a share of the kickbacks, often by wiring funds to an account controlled by Augustin.  In a six-week period, CHS 2 wired to one of Augustin's accounts kickbacks totaling more than $900,000.

4.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been since July 7, 2019.  As a Special Agent with the FBI, I am assigned to the Complex Financial Crimes Squad.  I have obtained extensive training and experience within the FBI on

investigating financial crimes leading to federal prosecutions.  Prior to becoming a Special Agent with the FBI, I was a Special Agent with the United States Secret Service ("USSS") from July of 2016 to July of 2019.  While working out of the Chicago Field Office within the USSS, I was assigned to the Financial Crimes Unit.  I have worked on multiple financial crimes cases that involved wire fraud, bank fraud, aggravated identity theft, and other frauds and swindles. Recently, I have been assigned to work with the U.S. Department of Justice and other law enforcement partners, including the Internal Revenue Service – Criminal Investigation ("IRS-CI") and the Small Business Administration Office of Inspector General, to investigate possible fraud associated with the stimulus and economic assistance programs created by the federal government in response to the COVID-19 program.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from my co-case agent, Special Agent Anthony Pizzola of the IRS-CI Cleveland, Ohio office, as well as from other members of law enforcement and from witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

6.      Augustin and CHS 2 originated this scheme to fraudulently obtain government-backed, forgivable loans by first obtaining a PPP loan for Augustin's own company, Clear Vision.  Immediately thereafter, Augustin brought in Williams to facilitate the scheme, while Augustin focused on recruiting both confederate PPP loan applicants and additional co-conspirators who could to recruit even more such confederates.  The network of confederates— and the scope of the scheme—grew quickly, both through Augustin's network and through broader word of mouth.  Although Williams appears to have worked on submitting a number of

applications in the days after the Clear Vision application, the scheme soon developed a stable model, with CHS 2 as the operational center, submitting the vast majority of applications.  The applications relied on falsified payroll numbers, supporting those figures with counterfeit IRS Forms 941 that CHS 2 and CHS 3 created.  CHS 2 also often used counterfeit bank statements to conceal the fact that many of the businesses had little to no funds on hand, and often had little to no ongoing business.  Williams largely facilitated communications between confederates and CHS 2, but also falsified checks to submit with some applications.  All the while, Augustin continued to recruit confederates and then pressure them to send their kickbacks once their loans were received.

7.    The following financial institutions are referenced herein:

a.    Bank 1 is a federally insured bank located in Cincinnati, Ohio.

b.    Bank 2 is a federally insured bank located in Fort Lee, New Jersey.

c.    Bank 3 is a federally insured bank located in Salt Lake City, Utah.

d.    Bank 4 is a federally insured bank located in New York, New York.

e.    Bank 5 is a federally insured bank located in New York, New York.

f.    Bank 6 is a federally insured bank located in San Francisco, California.

g.    Bank 7 is a federally insured bank located in Charlotte, North Carolina.

h.    Bank 8 is a federally insured credit union located in Vienna, Virginia.

8.    Bank Processor 1 is a financial technology company located in Redwood City, California, that enables businesses to apply online for PPP loans from two participating banks, Bank 2 and Bank 3.

### *The Paycheck Protection Program*

9.      The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic.  One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the PPP.  In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

10.      In order to obtain a PPP loan, a qualifying business must submit a PPP loan application, which is signed by an authorized representative of the business.  The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.  In the PPP loan application, the small business (through its authorized representative) must state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees.  These figures are used to calculate the amount of money the small business is eligible to receive under the PPP.  In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

11.      A PPP loan application must be processed by a participating lender.  If a PPP loan application is approved, the participating lender funds the PPP loan using its own monies, which are 100% guaranteed by the Small Business Administration ("SBA").  Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA in the course of processing the loan.

12.     PPP loan proceeds must be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities.  The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period of time after receiving the proceeds and uses a certain amount of the PPP loan proceeds on payroll expenses.

### *The Fraudulent Clear Vision PPP Loan*

13.     On or about May 13, 2020, Augustin and CHS 2 worked together to submit a fraudulent PPP loan application on behalf of Clear Vision, a business owned by Augustin. Augustin submitted a PPP loan of $84,515 to Bank 3 in Utah, through Bank Processor 1. Augustin reported that Clear Vision had 10 employees, and that the loan would be used to pay their wages.[2]

14.     Bank Processor 1 records show that the application was finalized on May 13, 2020, in the name of "clear vision music group llc [capitalization sic]," with an address in Hialeah, Florida.  "Phillip Augustin" was listed as Clear Vision's primary contact and 51% owner.  Augustin's known personal cellular phone number and email were listed as the contact information.

---

[2]     CHS 2 and Augustin had been emailing about obtaining Coronavirus-relief loans dating back to at least March 30, 2020, when Augustin sent CHS 2 a series of emails, attaching photographs of a Clear Vision 2019 tax return and an intake form for "SBA C.A.R.E.S. Relief Loans."  Although the return showed a net loss of $913,420, Augustin reported on the intake form that the business was "producing positive revenue" before February 15, 2020.  Contrary to his PPP application, the intake form also reported that Clear Vision had only five employees as of the end of March 2020.

15.     In interviews with investigators, CHS 2 has admitted that the application was based on documents he falsified for Augustin.[3]  The application included, for example, a purported February 2020 bank statement for a Bank 6 account ending in 6432.  The statement is a clear forgery, bearing an account holder name of "CLEAR VISION MUSIC GROUP" in the address section, but an account holder name of "[Company A]" next to the account number.  Company A is an entity unrelated to Clear Vision that is controlled by CHS 2, and CHS 2 has admitted that he was also falsifying bank statements for his own entities, and simply forgot to change the account holder name in both places when providing Augustin a falsified statement to use for the application.

16.     The application also included purported IRS Forms 941 (titled, "Employer's Quarterly Federal Tax Return") for all four quarters of 2019.  The purported tax forms show quarterly payroll of more than $100,000 each quarter.  That figure yielded the PPP loan application's "Average Monthly Payroll" figure of $33,806, which determined the $84,515 amount of the loan.  Each was signed by Augustin as the company owner, and also listed Augustin as the company's designee and as a "Paid Preparer," though he is not a paid tax preparer.  The Clear Vision Forms 941 follow the same style and pattern as the many other Forms 941 that CHS 2 falsified in the course of the scheme, including in the indicia of fraud.[4]

---

[3]     On June 25, 2020, investigators arrested CHS 2 and CHS 3 and executed search warrants at their residences.  Following his arrest, CHS 2 chose to cooperate with the investigation in the hope of obtaining favorable consideration in connection with his pending charges.  CHS 2 was interviewed on that day, and has continued to cooperate with the investigation after obtaining counsel.  Most of his statements related herein have been corroborated by records obtained from third parties or recovered from his electronic devices.

[4]     As noted above, Augustin was listed as both owner and paid preparer.  Dozens of other Forms 941 submitted in this scheme evidence the same error.  CHS 2 has admitted that these

IRS records show that Clear Vision did not, in fact, file any Forms 941 for any quarter of 2018 or

2019, and Florida Department of Revenue records show that Clear Vision did not report any

wages or employees for those years, or for the first quarter of 2020.

17.     As described in more detail in the following section, Augustin also sought out the

opportunity to speak with investigators through his attorney, and agreed to be interviewed with

his attorney present.  In that interview on July 6, 2020, Augustin falsely portrayed himself as a

victim, admitting that he received hundreds of thousands of dollars in payments from CHS 2 for

loan referrals, but claiming to be unaware that the applications CHS 2 was submitting were

fraudulent.  In that interview, Augustin effectively admitted that the documents submitted with

the application were not genuine, as he stated that he provided CHS 2 only Clear Vision's annual

corporate tax return, and did not provide any quarterly Forms 941, bank account statement, or

information about Clear Vision's payroll for use in the application.  Augustin falsely claimed

that it was CHS 2 who submitted the Clear Vision application from Augustin's house, using

Augustin's computer.

---

documents share that feature because he misunderstood the form, and he (or someone following
his instructions) prepared all of the Forms 941 at issue.

The content of the forms also indicate falsification.  All four quarterly forms are nearly
identical, and the four forms for Clear Vision comprise two pairs of forms that are identical,
down to the penny, with the first and second quarter matching, and the third and fourth quarter
matching.  They also evidence a pattern of payroll spending that is likely false: each of the
quarters shows significant increases from the first to second to third month of the quarter.  For
each identical pair, the same figures are reported for the tax liability incurred in the first month of
each quarter, the same figure for the second month of each quarter (increased substantially from
the first month), and the same figure for the third month of each quarter (increased substantially
from the second month).  The result is that the company reports a perfectly repeating cycle of
ascending payroll costs within each quarter, dropping down again at the start of the next quarter.
CHS 2 has explained that this was due to a formula he used, allocating different percentages of
the quarterly payroll tax liability to each month of each quarter.

18.     Contrary to Augustin's claims, emails between Augustin and CHS 2 show that CHS 2 prepared the bank statement and Forms 941 for Augustin, and sent them to Augustin for Augustin to use in his application. On the night that Augustin submitted the PPP application, CHS 2 sent an email to Augustin with one attachment, "CLEAR VISION GROUP feb 2020.pdf." That document was the same falsified Bank 6 February 2020 statement submitted with the Clear Vision PPP application. Later that evening, CHS 2 sent Augustin a series of emails, each with a falsified Form 941 for a quarter of tax year 2019, in native PDF form. The final versions of the Forms 941 CHS 2 sent match the scanned Forms 941 submitted with the Clear Vision PPP application, with one exception: the versions that CHS 2 emailed were not signed and dated in Part 5, while the versions Augustin submitted appear to have been printed and then signed and dated in black ink in Part 5, next to Augustin's name and the title "Owner." Specifically, they appear to have been signed by Augustin.[5]

19.     By contrast, signatures on other Forms 941 submitted in this scheme, prepared by CHS 2 and CHS 3, generally appear similar in style to one another, but very different from the style of signatures on the Clear Vision forms. CHS 2 has admitted to fabricating and signing numerous other Forms 941, but confirmed to investigators that he had only emailed Augustin the unsigned documents for Clear Vision.

---

[5]     Those signatures all resemble one another, and they resemble multiple exemplars of Augustin's true signature that investigators have obtained. For example, Augustin made a withdrawal from his Clear Vision account ending in 9641 at Bank 1 on May 9, 2020. The Phillip Augustin signature on the withdrawal slip from that transaction highly resembles that of the Phillip Augustin signature on the Forms 941. Augustin also provided documents to investigators through his counsel on or about July 9, 2020, in an attempt to show that his arrangement with CHS 2 was lawful, and Augustin's signatures in those documents also resemble the Forms 941 signatures. Examples in those documents include Augustin's signature on two promissory notes for the entity Augustin claimed to have established for his business dealings with CHS 2, 60 Day Funding & Investment Group, LLC, and two of its clients, both dated in early April 2020.

20.     Session records from Bank Processor 1 show that most of the activity on Augustin's account occurred on the night of May 13, 2020, starting at approximately 8:45 PM and ending at approximately 11:21 PM, after CHS 2 sent the final Forms 941.  Augustin's account with Bank Processor 1 also logged in on the evenings of May 14 and 17.  According to those records, all of those logins were from the same Comcast IP address.  According to Comcast records for the high-speed internet account assigned that IP address at the times of these logins, the logins occurred through the account with service at Augustin's residence at that time.  That Comcast account is in the name of Augustin's son, Person 8, but with a contact phone number that is Augustin's cellular phone, the same number listed on Augustin's Clear Vision applications and documents.

### *The Wider Scheme to Submit Fraudulent PPP Loan Applications*

21.     Following the success of Clear Vision's PPP application on May 13, 2020, Defendants and CHS 2 immediately began to work on obtaining more and larger PPP loans for Augustin's associates and others, generally for several hundred thousand dollars for each loan, up to as much as approximately $1.24 million.  Based on the evidence investigators have reviewed so far, Defendants and CHS 2 collectively coordinated the submission of applications for PPP loans that are together worth more than $24 million dollars, of which, at least approximately $17.4 million in loans were approved and funded.  The evidence also shows many more PPP loans were attempted but rejected by banks or their partners, or were planned and prepared, but not submitted before CHS 2's arrest.  The evidence indicates that all or nearly all of those loan applications were fraudulent.

22.     CHS 2 has admitted that he submitted the vast majority of these loans, largely through Bank Processor 1, and that they were fraudulent.

23.     Investigators have obtained many other PPP loan applications that CHS 2 has admitted he submitted as part of this scheme based on falsified documents, and have also obtained draft documents used or intended to be used in those applications or others.  These applications all follow the same pattern of fraud found in the Clear Vision application—many with obviously counterfeit February 2020 bank statements, and all with fabricated Forms 941 with the same indicia of fraud found in the Clear Vision application—but generally with even larger inflated payroll numbers, thus yielding much larger loans.  CHS 2 has explained to investigators that the figures in the Forms 941 were the product of a formula that allowed him to start with a target loan amount, and then "back into" the payroll figures on the form.  He explained how he used figures that would produce an average monthly payroll for 2019 that, when multiplied by 2.5, would yield the requested loan amount.  In turn, the number of employees reported was chosen based on the fictional payroll figures, chosen to avoid an average employee salary that might raise suspicion.

24.     CHS 2 has also explained that he tried to use bank statements showing that the company had a large balance.  Because so few companies had such a statement, and likely also because it was easier than keeping track of their true statements, CHS 2 repeatedly submitted near-replicas of the same falsified bank statements.  In particular, CHS 2 appears to have recycled one statement each from Bank 1, Bank 6, and Bank 7.  In recycling a statement, CHS 2 generally changed only the account number and the account holder's name and address, such that each version of the statement had identical figures and line items throughout the statement.[6]

---

[6]     For example, CHS 2 recycled a Bank 1 February statement that CHS 1 (described in the following section) had provided CHS 2 for Company 1 before CHS 1 began cooperating with law enforcement.  That statement was used repeatedly, with identical dollar figures throughout. Those identical figures include a "Total Combined Monthly Average Balance" of "$391,264.80"

25.     A review of records for bank accounts controlled by CHS 2 at Bank 5 confirm CHS 2's admissions that he received numerous kickbacks, often of approximately 25% of the amount of the loans, and that he regularly wired Augustin a share of each kickback in the early stages of the scheme.  CHS 2 explained that they were doing so many loans by the end of May that he changed course, instead wiring larger lump sums, collecting Augustin's shares of the kickbacks for multiple loans in one wire.

26.     Records for CHS 2's Bank 5 personal checking account ending in 6828 (the "CHS 2 6828 Account") for May 2020 show that CHS 2 received a large volume of wire transfers from businesses for which CHS 2 had recently obtained sizable fraudulent PPP loans. The following table show the date and amount of each entity's loan and wire to CHS 2:

| Entity Receiving Loan and Sending Wire | Loan Date | PPP Loan Amount | Wire Date | Wire Amount |
|---|---|---|---|---|
| Company 5 | 5/15 | $363,177 | 5/18 | $72,635.40 |
| Company 6 | 5/15 | $363,177 | 5/18 | $81,635 |
| Company 7 | 5/17 | $258,575 | 5/20 | $64,645 |
| Company 8 | 5/18 | $426,717 | 5/20 | $90,000 |
| Company 9 | 5/18 | $84,515 | 5/21 | $21,130 |
| Company 10 | 5/14 | $389,627 | 5/21 | $97,418 |
| Company 11 | 5/18 | $416,752 | 5/22 | $104,188 |
| Company 12 | 5/21 | $708,065 | 5/26 | $50,000 |
|  |  |  | 5/27 | $40,000 |
|  |  |  | 5/29 | $50,000 |
|  |  |  |  | (Tot.: $140,000) |
| Company 13 | 5/23 | $414,675 | 5/28 | $103,664.25 |

and an "Ending Balance" of "$362,220.38."  The only apparent changes from the falsified Company 1 statement are the account number and the name of the company/account holder, and an apparently inadvertent change in the document's primary font, which does not match the font used in true Bank 1 statements.  Every line item and other detail of those statements is unchanged—including the location of the transactions, which would suggest the purported account holders based in Florida and other areas far from Ohio operate primarily in northeast Ohio.

27.     Similarly, records for a Bank 5 business account ending in 8588 in the name of Company A (the "Company A 8588") for May 2020 show that the Company A 8588 Account received a large volume of wire transfers from businesses that likewise had recently received fraudulent PPP loans through CHS 2:

| Entity Receiving Loan and Sending Wire | Loan Date | PPP Loan Amount | Wire Date | Wire Amount |
|---|---|---|---|---|
| Company B[7] | 5/17 | $702,720 | 5/20 | $42,380 |
| Company 14 | 5/20 | $488,565 | 5/26 | $122,155 |
| Company 15 | 5/21 | $488,565 | 5/27 | $96,000 |
| Company 16 | 5/21 | $488,565 | 5/27 | $97,700 |
| Company 17 | 5/22 | $488,565 | 5/28 | $122,000 |
| Company 18 (Person 5)[8] | 5/26 | $1,246,565 | 5/28 | $311,641.67 |

28.     Bank 5 records also indicate that CHS 2 opened a new business account ending in 0640 under the name of Company C (the "Company C 0640 Account").  That account includes incoming wires of $22,500 and $80,000 in early June that are connected to two additional entities that submitted fraudulent PPP loan applications through CHS 2.

29.     Investigators are still receiving and analyzing records for CHS 2's and Augustin's accounts, but based on a preliminary analysis, as of July 24, 2020, investigators had identified a total of $2,367,765.82 in transfers to CHS 2's accounts from entities that each obtained a sizable PPP loan and that were identified in the PPP files seized from CHS 2's and CHS 3's residences, as described below—or from individuals associated with those entities.[9]

---

[7]     Company B is a company controlled by CHS 3.

[8]     Company 18 obtained this loan with Person 5 listed as the contact for the business. Person 5 is the same professional football player that Augustin had referred to CHS 2 early in their relationship.  The Company A 8588 Account records show this wire was received not from Company 18, but from an account in Person 5's name.

[9]     Person 5, who had already wired the full 25% kickback from the Company 18 loan, wired an additional $219,000 to CHS 2 in two separate transactions, included in this total.  According

30.     A review of CHS 2's and Augustin's bank records also shows that, after receiving these wires, CHS 2 regularly wired large sums to Augustin's account at Bank 1 in the name of 60 Day Funding & Investments LLC ("60 Day Funding"), as well as to Person 14.  Text message and email records show, and CHS 2 confirmed, that Person 14 also referred clients to the scheme.  Based on the analysis thus far, it appears that, between May 19, 2020 and June 22, 2020, the 60 Day Funding account received at least $900,789.35 in wires from CHS 2's accounts, of which approximately $40,000 was actually intended as a payment to Person 14 for her referrals.[10]  In addition, CHS 2 directly sent Person 14 two wires totaling $66,514.16 for other referrals, and sent Williams a $16,000 wire on May 18, 2020.

31.     The PPP loans identified above as implicated in the foregoing kickback payments to CHS 2 represent only a fraction of the overall scheme.  In executing search warrants at CHS 2's and CHS 3's respective residences, federal agents found stacks of paper printed out and organized by entity, containing an "intake form," fabricated Forms 941, or both for each entity.  The intake forms contained fields for the information needed to fabricate the documents and fill out other aspects of the PPP application: identifying information about the owner and company, as well as bank account information for receiving the loan.  A section at the end marked "BELOW IS OFFICE USE ONLY" included blank fields for the "Number of Employees," "Monthly Payroll Expense," and "SBA Loan Pre-Approval Amount."  Between CHS 2's and

---

to CHS 2, $19,000 was compensation for CHS 2 to assist Person 5 with obtaining forgiveness of his PPP loan, while $200,000 was intended for purported business investments that Augustin and CHS 2 offered Person 5.  Person 5 had also referred other businesses to CHS 2 to obtain PPP loans, and had been discussing with CHS 2 in text messages investment opportunities and CHS 2's assisting Person 5 with obtaining forgiveness of his PPP loan.

[10]     CHS 2 explained that one wire to that account for approximately $40,000 was actually intended as a payment to Person 14, who was having trouble receiving the wire directly from CHS 2, and so she arranged to receive it through Augustin.

CHS 3's residences, investigators seized paper files for PPP loan applications for approximately 80 different entities.

32.     Federal agents also found text message and email records that referenced additional PPP loan applicants that had been referred to CHS 2 by Augustin, Williams, Person 14, or other associates of Augustin.  Data obtained from the SBA corroborate many of those text messages and emails.  Together, the conspirators appear to have conspired to submit at least 90 fraudulent loans, with approximately 59 of those loan applications submitted to banks or bank processors for a total of more than $24 million.  It appears that at least 42 of those loans were funded for a total of approximately $17.4 million.

***Email, Text Message, and Loan Records Illustrate the Conspirators' Roles in the Scheme***

33.     Defendants and CHS 2 did not wait long after submitting the Clear Vision application to begin coordinating the submission of other applications.  Augustin was in regular contact with CHS 2 about referrals and documents to be used specifically in PPP loan applications, which Augustin knew were fraudulent.  Augustin also recruited Williams, who CHS 2 has identified as Augustin's girlfriend and the mother of one of his children, to assist him and to communicate with CHS 2.  Recovered text messages and emails show that Williams regularly communicated with CHS 2 regarding CHS 2's financial dealings with Augustin.

34.     For example, on or about May 14, 2020, the day after Augustin submitted the Clear Vision loan application, CHS 2 began corresponding with Augustin and Williams by email and text messages regarding multiple businesses that Augustin referred for PPP loans.

       a.      At approximately 12:14 PM, Williams sent CHS 2 a text message with the address and federal employer identification number ("EIN") for Company 5 and the name of its owner, Person 10.

b.      At approximately 12:50 PM, Williams, sent CHS 2 an email with a PDF attachment that appears to be a falsified Bank 4 check in the name of Person 5, with an address in St. Petersburg, Florida.  The image of the check appears not to be a scan of an authentic check, but rather, to have been produced on a computer and, as the subject line reads, "Converted to PDF."  The check appears to have the account holder name and address, bank name, account number, and routing number superimposed on the image of a check—similar to the preview a consumer could see online before ordering new checks to be printed for his or her account.  The metadata for the PDF shows the file was created from a Microsoft Word document.

c.      At approximately 2:19 PM, CHS 2 sent an email to Augustin.  In the email, CHS 2 included one attachment, a purported February Bank 6 bank statement for an account in the name of Company 5, with a typo in the name.  But for a change in the account number and the name and address in the upper left portion of the first page, this document was identical to the Clear Vision bank statement submitted with its PPP loan.  Company A was still listed underneath the account number.

d.      Minutes later, CHS 2 sent another email to Augustin with a revised version of the same February bank statement.  In this version, CHS 2 had replaced Company A underneath the account number with Company 5's name.  This version of the statement matches the bank statement submitted with Company 5's PPP loan application.

e.      At approximately 3:25 PM, CHS 2 sent an email to Augustin, attaching four fabricated IRS Forms 941 for Company 5, with Company 5's and Person 10's

contact information, and Person 10 listed as the paid preparer for all four quarters, as in the falsified Clear Vision Forms 941.

       f.      At approximately 3:30 PM, Williams sent CHS 2 a text message providing "[Person 11]'s information," including Company 10's address, EIN, bank account information and the following: "Annual Revenue - $4,675,552" and "# of employees - 16."  CHS 2 responded by asking for Person 11's phone number, and when he got no answer, texted Augustin for it.  Augustin immediately responded with her number.

       g.      Hours later, beginning at approximately 6:39 PM, Williams sent CHS 2 a series of text messages providing similar information for Company 6 and its owner, Person 12, adding, "This is for his 941's."  After stating, "He has 15 employees," Williams followed up with, "Please let me know what the payroll average is once you calculate it."

35.      CHS 2 also submitted fraudulent loan applications on behalf of two entities, Company 1 and Company 2, both controlled by another individual who later decided to cooperate with the investigation ("CHS 1"), and both based in the Northern District of Ohio. Files for both entities were found in CHS 2's and CHS 3's PPP files.  CHS 3 began soliciting CHS 1's participation in text messages on or about May 15, 2020, requesting information on Company 1, which CHS 1 provided.  CHS 3 followed up with a screenshot showing, "You qualify for $554,232," and stating that confirmations and instructions would be sent.

36.      On or about May 16, 2020, beginning at approximately 8:31 PM, Williams sent CHS 2 a series of text messages providing her email address and then stating, "Need the [Bank 8] statement and 941's when you get minute to create them."

37.     On or about May 16, 2020, at approximately 9:03 PM, CHS 2 sent an email to Williams.  The email attached a purported Bank 1 February statement for Company 4, which was adapted from the falsified Company 1 February statement, with only changes to the account number and the account holder's name and address.  That document matches the falsified bank statement submitted with Company 4's fraudulent PPP loan application, which was finalized on or about May 17, 2020.  In the body text, CHS 2 told Williams that the attachment was the bank statement, and that she needed to get a voided check for Bank 8, and that, "when you apply you use acct and routing number from [Bank 8]."  Investigators are aware that the PPP loan funds for Company 4 were sent to Bank 8, but the account was frozen soon thereafter, preventing Company 4's owner from wiring CHS 2 the kickback.

38.     On or about May 17, 2020, CHS 2 exchanged emails with Williams and Person 14 about the process for facilitating the scheme.

        a.      At approximately 9:36 AM, CHS 2 sent an email to Williams and Person 14.  In the email, CHS 2 asked Williams and Person 14 to fill out the attached document entitled "[COMPANY C] SBA INTAKE.docx."  The attachment was a blank form labeled "[COMPANY C] INFORMATION INTAKE SHEET."  That form substantially matched the many forms recovered from CHS 2's and CHS 3's residences, which were filled in with information on businesses for which fraudulent PPP loan applications had been submitted or planned.  It contained the same section for "OFFICE USE ONLY" with fields for, among other things, the number of employees and monthly payroll expenses.

        b.      Minutes later, at approximately 9:55 AM, Williams replied to CHS 2 and Person 14.  In the email, she stated, "Ok, I will do it going forward for all new clients."

39.     Thereafter, Person 14 sent numerous emails to CHS 2 attaching completed Company C Intake Forms that left the section marked "OFFICE USE ONLY" blank.  Some of these forms included a dollar figure, such as $300,000 or $400,000, listed above or below the "OFFICE USE ONLY" heading, indicating the amount of the loan requested.

40.     On or about May 18, 2020, Williams sent CHS 2 an email with an image of another counterfeit check, stating, "Here is the check. Please review for accuracy."  The check resembled the falsified Bank 4 check in the name of Person 5 that Williams had previously sent to CHS 2.  However, this check bore the name and address of another fraudulent PPP applicant, Company 27, and Bank 6 was the listed bank on the check.

41.     On or about May 20, 2020, CHS 2 finalized an application on behalf of Company 1 for a $554,232 PPP loan from Bank 2 in New Jersey, through Bank Processor 1.  Company 1's application was approved, and the funds were then wired from an account outside of Ohio to a bank account at Bank 1 in Ohio.  However, after the wire was transmitted, Bank 1 placed a hold on the account to allow a review of the transaction.

42.     On or about May 28, 2020, CHS 2 finalized an application on behalf of Company 2 for a $320,767 PPP loan from Bank 3, through Bank Processor 1.  That loan was funded and disbursed to a bank account in Company 2's name.  Company 2 is a construction company operated under the name of Person 2, a relative of CHS 1.  In interviews with investigators, CHS 1 stated that after the PPP loan for Company 1 was approved in May 2020, he had arranged for CHS 2 and CHS 3 to obtain another PPP loan for Company 2.  CHS 1 also admitted that Company 1's and Company 2's loans were based on fraudulent representations, including a falsified Bank 1 February statement for Company 1, and further stated that Company 1 and

Company 2 do their banking and accesses their funds at bank branch locations within the Northern District of Ohio.[11]

43.     After Company 2's PPP loan was approved, CHS 1 received instructions to wire CHS 2 and CHS 3 approximately $80,000 of the loan proceeds (approximately 25% of the total loan proceeds received in the name of Company 2).  CHS 1 received wiring instructions by email, and thereafter directed Person 2 to visit a Bank 4 branch in the Cleveland, Ohio area, and request that Bank 4 wire approximately $80,190 to the Company A 8588 Account, consistent with the instructions he had received.  Person 2 did so on or about June 1, 2020, and CHS 2 received the wire in the Company A 8588 Account the same day.  CHS 1, CHS 2, and CHS 3 coordinated these loan applications and the kickback payment through the use of numerous interstate wire transmissions—phone calls, text messages, and emails—between Florida and the Northern District of Ohio.

44.     Throughout this time, Augustin and CHS 2 continued to exchange text messages about referrals and the status of loans, and also frequently discussed who had sent a kickback and when CHS 2 would send Augustin his share.  For example, on or about May 21, 2020, Person 11 wired CHS 2 $97,418 from a Bank 6 account in the name of "[Person 11] DBA [Company 10]" that, the previous day, had received a PPP loan in the form of a $389,627 wire from Bank 3.  At approximately 11:07 AM on May 21, Augustin sent a text message to CHS 2 stating, "[Company 10's] wire is done so is [Company 11]."  CHS 2 responded by acknowledging a wire for "97418"

____

[11]     On or about June 8, 2020, investigators approached CHS 1 and discussed the Company 1 PPP loan with him.  After obtaining counsel and deciding to cooperate with the investigation in the hopes of receiving favorable consideration in connection with his pending case, CHS 1 agreed to additional interviews, and the statements of CHS 1 herein are from those interviews. CHS 1 admitted in his June 12, 2020 interview that he had not told the complete truth in his June 9 interview and should have disclosed the Company 2 loan to investigators when asked about the extent of his loan activity.

from Person 11/Company 10, and a wire from Company 9, but noting that he was "still waiting on" Company 11 and Company 4.

45.     On or about May 28, 2020, at approximately 10:16 PM, Augustin reached out about Person 19, the purported owner of Company 21, stating, "Don't forget about [Person 19]." CHS 2 responded, "Working on her statement not easy," to which Augustin replied, "Ok."  CHS 2 finalized Company 21's fraudulent PPP loan application on June 1, 2020, submitted with a falsified near replica of the same Bank 7 statement CHS 2 submitted with a number of other fraudulent PPP loans.

46.     Augustin regularly provided CHS 2 with account information for wires, and CHS 2 also provided Augustin wire instructions to pass along to the loan recipients.  Both Augustin and Williams provided CHS 2 information for one of Williams's accounts.

47.     Emails and text messages among the co-conspirators continued up to and even including the day of CHS 2's arrest.  On or about June 25, 2020, at approximately 11:19 AM, Augustin sent CHS 2 an email, forwarding a June 8, 2020 email from Williams to Augustin, with an image of a blank check attached.  The check resembled the falsified Person 5 and Company 27 checks that Williams had previously sent to CHS 2.  However, this check bore the name and address of one of Augustin's "Top Gun" entities, "Top Gun Consulting and Management LLC," and Bank 1 was the listed bank on the check.

48.     Shortly after CHS 2's arrest, Williams canceled her Comcast internet account, through which she had submitted the fraudulent PPP loan applications for Company 5 and Company 10.  Specifically, Bank Processor 1's IP address log files for those companies return to the same IP address at all times when the accounts for those applications logged in, between May 14, 2020 and May 18, 2020.  At those times, according to Comcast records, that IP address was

assigned to a Comcast high-speed internet account in Williams's name, with a service address at a residence in Weston, Florida associated with Williams.  That service had been active since August 2018, but was disconnected on June 29, 2020.

***Augustin's Obstruction of the Investigation and Admissions about His Role in the Scheme***

49.     Even after learning at the end of June of CHS 2's arrest and that Bank 1 had concerns about Augustin's accounts, Augustin continued to commit acts in furtherance of the scheme, reaching out to investigators to mislead them in his interview, and thereafter providing documents to achieve that goal.  In summary, Augustin falsely portrayed himself as a passive recipient of referral fees based only on referrals he had made before the COVID-19 pandemic and the PPP program.  Augustin misled investigators about, for example, the extent of his and his associates' knowledge of, and involvement in, the misstatements contained in the PPP loan applications.  In fact, Augustin was in regular contact with CHS 2 about referrals and documents to be used specifically in PPP loan applications, which Augustin knew were fraudulent.  He then provided documentation of those prior referrals to support his misrepresentations.

50.     Augustin, accompanied by counsel, appeared in person at IRS offices in Plantation, Florida, for a voluntary interview on July 6, 2020.  Augustin met with two Florida-based law enforcement agents with, respectively, IRS-CI and the Federal Deposit Insurance Corporation Office of Inspector General.  Other investigators appeared by teleconference, and identified themselves and their locations, including multiple investigators in the Northern District of Ohio.[12]  Investigators then asked Augustin if he would like to record the interview, and he and his counsel agreed to audio record the interview.

---

[12]     Affiant, Special Agent Pizzola, and Northern District of Ohio Assistant U.S. Attorney Elliot Morrison identified themselves and their positions, and their location in the Cleveland, Ohio area.

51.     During the interview, Augustin made the following statements, among others, about the Clear Vision PPP loan application:

a.      Augustin stated that, early in 2020, Augustin had paid CHS 2 $29,000 for CHS 2 to repair his credit and obtain a business loan for Augustin, for as much as $1 million.  Augustin, who worked as a manager for professional football players, had also referred some of his clients, including Person 5, and other contacts to CHS 2 for the same services, with the understanding Augustin would receive $5,000 per referral.  Going into May 2020, CHS 2 had not delivered as promised on those services for Augustin or any of his referrals.

b.      Augustin also claimed that, in approximately mid-May 2020, CHS 2 came to Augustin's house to explain his new plan to obtain a loan for Augustin and clients he had referred.  CHS 2 explained that they could get disaster loans, and they would just have to use the loans for their businesses, such as for rent and employees.

c.      Augustin stated that CHS 2 then prepared and submitted the Clear Vision application from Augustin's house, using Augustin's computer.  For the application, CHS 2 obtained from Augustin only the identifying information for Augustin and Clear Vision, a voided check, and a corporate tax return, but nothing about payroll.  Augustin did tell CHS 2 that Clear Vision had eight employees, but sometimes added two more people, meaning up to 10 employees.  Augustin only provided the documents and information requested and watched CHS 2 while playing two games of pool.[13]

---

[13]     By contrast, CHS 2 reported that Augustin handled the process from what CHS 2 assumed was Augustin's house, while CHS 2 was at CHS 2's residence, emailing Augustin documents and discussing the process with him.  Telephone records corroborate CHS 2's account and refute Augustin's.  Cellular tower data associated with CHS 2's cellular phone show

       d.      Augustin claimed that he spoke to his accountant about the loan the day after his exchange with CHS 2, and the accountant explained that Augustin needed to set up a separate account for the loan proceeds, and use it to pay rent and payroll. The money arrived a day or two later, and at that time, Augustin had no concerns about the legality of the arrangement. Augustin did not have any such concerns about his PPP loan, or those of the people he referred, until approximately the end of June, when Bank 1 froze his accounts and he learned a Bank 1 investigator was saying that his money was connected to fraud.[14] He and his counsel then discovered and reviewed Affiant's Northern District of Ohio complaint against CHS 2 and CHS 3, prompting them to reach out to the Assistant U.S. Attorney on the case.

52.      Augustin also made the following statements, among others, about his referring clients to CHS 2 and the payments he received or expected to receive for those referrals:

       a.      Augustin estimated that he had referred 20 – 25 people to CHS 2, and some of those people, in turn, referred others.

---

that at the time of the Bank Processor 1 logins to the Clear Vision account from Augustin's home, CHS 2 was in the vicinity of his own home, and not in the vicinity of Augustin's home, which was approximately eight miles away. CHS 2 was also in the vicinity of his home, not Augustin's, at the times on other days that the Clear Vision account logged in to Bank Processor 1's system from Augustin's house. In addition, recovered text messages show that, at approximately 8:54 PM on May 13, 2020, in the middle of the online sessions for the submission of the Clear Vision application, Augustin appears to have attempted to call CHS 2 and received the text message response, "Can't talk, call you right back." Augustin then immediately sent CHS 2 a text message stating, "Call me ASAP." This telephone exchange would not have occurred if, as Augustin reported, CHS 2 and Augustin were in the same room conversing.

[14]     In fact, on May 13, 2020, the same day he submitted his PPP application, Augustin sent a text message to CHS 2 at approximately 6:49 PM with a link to an article and television news report regarding fraud charges against an Atlanta-based reality television star for fraudulently obtaining a PPP loan.

      b.      Augustin stated that he had referred all of these individuals before the PPP began, when CHS 2 was offering the combination of credit repair and access to a $1 million loan, and that he did not provide CHS 2 with client information specifically to obtain PPP loans and did not provide additional referral information after his Clear Vision PPP loan.  Instead, CHS 2 on his own initiative reached out to the people that Augustin had previously referred.[15]

      c.      Augustin claimed that, if CHS 2 successfully obtained a PPP loan for a client that Augustin referred or for another client that one of those clients, in turn, referred, and if that PPP loan was paid out, Augustin would receive a share of the 25% fee that CHS 2 was charging.  Augustin's portion was generally in the range of 7% – 10% of the loan, sometimes more, up to 12.5%.[16]

53.     The documents that Augustin provided through his counsel to investigators on or about July 9, 2020 show financial arrangements between CHS 2, Augustin, and approximately 31 clients, and the documents include what appears to be a note from Augustin to investigators identifying four of the people he referred to CHS 2 as people who, in turn, referred others to CHS 2.  These documents appear to have been calculated to support Augustin's false claims to investigators.

---

[15]     As documented above, however, Augustin was in regular contact with CHS 2 about these referrals after May 13, 2020, and pushed CHS 2 to act on particular clients at particular times.

[16]     In fact, when kickbacks were paid, Augustin generally received 12.5%, and lesser amounts were the exception rather than the rule.

## **CONCLUSION**

54.     Based on the forgoing, I respectfully submit that there is probable cause to believe

that PHILLIP J. AUGUSTIN and WYLEIA NASHON WILLIAMS committed the Target

Offenses, and to issue the requested arrest warrants.

_____
Matthew Scalisi
Special Agent
Federal Bureau of Investigation


This affidavit was sworn to by the affiant by telephone after a PDF was transmitted by email, per
Fed. R. Crim P. 3, 4(d), and 4.1 on this day, July 28, 2020.

_____
David A. Ruiz
U.S. Magistrate Judge